**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

KYLE KIMOTO,                          )
                                      )
                    Petitioner,       )
                                      )
vs.                                   )          Case No. 13-cv-0012-MJR
                                      )
UNITED STATES OF AMERICA,             )
                                      )
                    Respondent.       )

<u>**MEMORANDUM AND ORDER**</u>

**REAGAN, Chief District Judge:**

In June 2007, Kyle Kimoto was indicted on wire and mail fraud charges in connection with his role in a national debit card telemarketing scheme. Kimoto was tried by jury and convicted of all of the counts of the indictment in April 2008, and sentenced to 350 months in prison. One partially successful appeal led to a limited sentencing remand and a subsequent *pro se* appeal left Kimoto's convictions and sentence affirmed in the entirety. In January 2013, Kimoto filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, claiming that his convictions and sentence should be overturned because the jury didn't find that each of the transactions that fed into his wire and mail convictions and his ultimate sentence involved the use of interstate commerce; because his counsel was ineffective for not pressing him to plead guilty; because his convictions and sentence violated the Tenth Amendment; and because his sentence violated the Eighth Amendment. Kimoto later

supplemented his § 2255 petition with a number of motions to take notice, all arguing that his convictions were flawed based on intervening Supreme Court decisions.

The United States responded to the original motion and Kimoto has replied, so the merits of Kimoto's petition and his subsequent motions are now before the Court for review.  Kimoto's § 2255 petition and his subsequent notice motions will be denied.

## Background

Kyle Kimoto was the president of Assail, Inc., a telemarketing outfit based in St. George, Utah.   In 2001, Assail began marketing a financial package developed by another telemarketing company named Rockwell Solutions.  The financial package from Rockwell included a pay-as-you-go debit card, along with other promotional discounts, and was called First Financial Solutions.   After Assail ended its association with Rockwell Solutions, it began marketing a similar product put together by the Bay Area Business Council.  At the same time, Assail also marketed a similar package on its own, under the names Premier One, Advantage Capital, and Capital First.

Assail marketed these packages by making cold calls to people throughout the United States—those names came from lists of individuals who had applied for credit and been turned down in the past or who had subpar credit history.  Assail's calling plan was designed to make individuals believe that the cold call was in response to a recent credit application and that the debit card was actually a credit card: a telemarketer would call the prospective buyer, remind him of a recent credit request, and advise him that he was now eligible to receive a Visa or MasterCard.   The telemarketer would then ask about the applicant's income, put him on hold for a fake

2

authorization (no authorization actually took place), and then return to the line to let the consumer know that he was guaranteed to receive a MasterCard with a pay-as-you-go limit of $2000.00.  No security deposit was needed to get the card; all the consumer had to do was pay a "processing fee" of $159.95.  If the consumer agreed to purchase the financial package, he was transferred to a verifier, who obtained oral authorization to charge the processing fee.  During that call, the consumer heard an automated disclosure mentioning the pay-as-you-go MasterCard and advising that there would be no credit on the card until a payment was made.  If consumers asked the verifier questions, the verifier attempted to give responses that confirmed the impression that the consumer would be receiving a credit card rather than a debit card.

A great many of Assail's consumers didn't like the cards they received.  For cards sold in connection with the Bay Area Business Council, there were as many as one hundred thousand customer complaints during a seven-month period, with customers complaining that they did not receive actual credit cards.  For cards sold by Assail through its own programs, customer service was outsourced to Specialty Outsourcing Solutions in Waco, Texas.  Like Bay Area, Specialty received thousands of calls from consumers angry that they had not received a credit card, but only a plastic card with a MasterCard logo or an application for a pay-as-you-go stored value card.  Some of the customers received partial refunds, but many were given the runaround by customer service agents, who were trained to tire the customers with questions and clarifications.

By 2002, the Federal Trade Commission became aware of the telemarketing scheme.  In August 2002, the Commission filed a civil complaint against Peter Porcelli,

who operated Bay Area Business Council, and seized a great many of Bay Area's records.   In October 2002, a search warrant was executed at the offices of Specialty Outsourcing Solutions, and federal agents interviewed the president of Specialty and many of Specialty's employees.   In January 2003, the Federal Trade Commission filed a civil complaint against Assail, Kimoto, and others, alleging that all involved had marketed fraudulent products and services to United States consumers or facilitated that conduct.   A search warrant was executed at the offices of Assail shortly after the civil complaint was filed, leading to the seizure of computers and documents.   These efforts evidently made Kimoto nervous: after the search of Bay Area and Specialty, Kimoto burned a number of Assail's business records, told a compatriot to get rid of his computer, and directed Assail employees to delete some company emails.

The Federal Trade Commission's civil proceedings ultimately shut down Bay Area Business Council and Assail, and the Commission's investigation revealed losses to consumers to the tune of $39 million.   Criminal proceedings soon followed.   On June 20, 2007, Kimoto was charged in a 14-count indictment returned by a grand jury in the Southern District of Illinois.   Count 1 of the indictment charged Kimoto with conspiracy to commit mail fraud, wire fraud, and money laundering; count 2 charged Kimoto with mail fraud based upon the mailing of a benefits package to a victim in the Southern District; counts 3 through 8 alleged wire fraud based on telemarketing calls to Illinois victims; and counts 9 through 14 charged Kimoto with wire fraud related to the debit transfer from the consumer's bank accounts to processors for the processing fee.

4

Kimoto's trial began in late March 2008 and lasted ten days.  The Government's theory was that Kimoto defrauded hundreds of people by using deceptive scripts in the marketing of his financial products.  For his part, Kimoto claimed that he was engaged in the legitimate business of selling debit cards, that the telemarketing scripts weren't deceptive, and that he did his best to ensure that employees who went too far—by representing to a customer that he was getting a credit card and not a debit card—were fired.  The jury didn't buy Kimoto's defenses and convicted him on every count.

Kimoto's sentencing hearing took place on September 5, 2008.  The presentence investigation report calculated a base offense level of 7 and then increased that by various amounts based on Kimoto's circumstances.  The actual loss from Kimoto's scheming was estimated at approximately $39 million, a figure that represented the total amount of funds debited from individual accounts in response to Assail's telemarketing calls, less refunds issued.  That loss amount increased Kimoto's base offense level by 22 points.  His offense level was increased six more points because the number of victims exceeded 250, by two more points because Kimoto committed the offense after being banned from conducting business as a credit service organization, by two more points because the victims were vulnerable, by four more points because Kimoto was an organizer, and by two more points because Kimoto obstructed justice by destroying evidence.  Those adjustments led to a total offense level of 45, which was treated as an offense level of 43 (the highest level on the sentencing table).  An offense level of 43, regardless of a defendant's criminal history, results in a recommended life sentence.  The Court accepted the advisory calculation but determined that a life

sentence was unreasonable, instead sentencing Kimoto to 25 months on each count of conviction, to be served concurrently. Kimoto's ultimate sentence was 350 months.

Kimoto appealed his convictions and his sentence, arguing that the evidence was insufficient to convict him and that the loss calculation and victim calculation used for sentencing were flawed. The Seventh Circuit affirmed Kimoto's convictions and ruled that any error in the loss calculation was immaterial because the intended loss would easily exceed the actual loss. That said, the Seventh Circuit ordered a limited remand on the victims calculation, directing the Court to determine whether there were more than 250 individuals who suffered loss from Assail's deceptive sales efforts. The Court conducted a hearing on that point on June 4, 2010, and ruled that the number of victims easily exceeded 250, meaning that Kimoto's original sentence would stand.

After the limited remand, Kimoto again appealed, this time proceeding *pro se*. He argued that his convictions violated the Tenth Amendment because prosecutions for fraud are the province of state government; that the mail and wire fraud statutes are unconstitutionally vague; and that the loss and number of victim calculations were improper because they were ruled on by a judge rather than a jury. The Seventh Circuit found Kimoto's arguments frivolous and affirmed his convictions and sentence.

On January 7, 2013, Kimoto filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Since he filed his petition, Kimoto has also filed several motions to take "judicial notice." The United States has responded to Kimoto's overarching § 2255 motion, and Kimoto's motions are now before the Court for review.

## Discussion

Kimoto filed his petition pursuant to 28 U.S.C. § 2255, which allows a defendant to attack the validity of his sentence if it was "imposed in violation of the Constitution or laws of the United States," if the sentencing court imposed sentence "without jurisdiction," if the sentence was "in excess of the maximum authorized by law," or if the sentence is "otherwise subject to collateral attack."  While Kimoto's petition is a bit difficult to make out, Kimoto seems to assert four grounds to set aside his convictions or sentence:  he says that his counsel was ineffective for not arguing that the jury had to find that each of the transactions that fed into his conviction and sentence involved the use of interstate commerce; that his counsel was ineffective for not pressing him to plead guilty; that his convictions and sentence violated the Tenth Amendment; and that his 350-month sentence constituted cruel and unusual punishment.

The Court will begin with Kimoto's argument that his counsel was ineffective for not objecting to his convictions and sentence on the grounds that the underlying transactions weren't linked to interstate commerce.  To make out a claim of ineffective assistance, a petitioner must demonstrate that his counsel's performance was deficient and that, but for counsel's deficient performance, a "reasonable probability exists that he would have received a different sentence."  *Mertz v. Williams*, **771 F.3d 1035, 1043-44 (7th Cir. 2014).**  Both aspects of this test must be demonstrated by a § 2255 petitioner to succeed on a habeas claim—if a prisoner fails to make an adequate showing on deficient performance or prejudice, he hasn't established ineffective assistance, and his claim will fail.  *United States v. Montgomery*, **23 F.3d 1130, 1134 (7th Cir. 1994).**

7

Kimoto's first claim trips over the deficient performance requirement—Kimoto can't show deficient performance here, as counsel didn't err in failing to make any commerce-related objections.   As it concerns Kimoto's convictions, Kimoto was convicted on fourteen counts:  one count for conspiracy to commit mail and wire fraud; one count for mail fraud; six counts of wire fraud for making fraudulent calls; and six counts of wire fraud for receiving fraudulently-obtained money via automated clearing house debit transfers.  He is right that the mail and wire counts all have "commerce" elements, *United States v. Spirk*, **503 F.3d 619, 621 (7th Cir. 2007)**, but the testimony and exhibits at trial show that Kimoto's counts involved United States Postal Service mail, interstate phone calls, and interstate debit transfers, so the commerce elements were satisfied.  (*E.g.*, 4/1/2008 Trial Tr. 12:16-12:18, 84:25-85:5; 168:5-168:13.)  Kimoto also claims that the United States had to prove that he knew he was affecting interstate commerce for his convictions to hold up, but that's only part true for his mail fraud conviction and wrong for his wire fraud convictions.  For mail fraud, all that needed to be shown was that Kimoto acted "with the knowledge that the use of the mails would follow in the ordinary course of business, or where such could reasonably have been foreseen," *United States v. Useni*, **516 F.3d 634, 648 (7th Cir. 2008)**, and there was ample evidence offered at trial to show that Kimoto knew that packages were being sent in the course of business.  (*E.g.*, 4/2/2008 Trial Tr. 11:24-17:12; 26:25-29:21; 40:17-43:1; 88:4-88:15.)  For his wire fraud convictions, knowledge of interstate transmissions is not required.  *United States v. Sawyer*, **733 F.3d 228, 229-230 (7th Cir. 2013); *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994).**  In the end, had counsel objected to

Kimoto's mail and wire convictions on commerce-related grounds, he would have lost. There was no deficient performance in skipping the objections and staying mum.

Kimoto also suggests that counsel was deficient for not making similar objections to the loss calculation at sentencing—he says that the jury (not the judge) had to find that each of the transactions used to total up the $39 million loss amount had a link to interstate commerce for him to be penalized under federal sentencing law. He's wrong on the law in two ways. First, the $39 million loss amount was used to enhance his sentence, not as a basis for a count of conviction. The facts relevant to a sentencing enhancement can be found by a judge rather than a jury. *United States v. Owens*, **441 F.3d 486, 489-90 (7th Cir. 2006)**. There's an exception to that rule for facts that affect the statutory maximum or minimum, *United States v. Garcia*, **754 F.3d 460, 473 (7th Cir. 2015)**, but nothing like that is present in this case. Kimoto's counts didn't involve a mandatory minimum, and he was sentenced below the mandatory maximum on each count. To be sure, the Court ruled that his sentences on those counts would run consecutively, but that kind of stacking doesn't create the need for a jury to rule on the sentencing facts. *Id.; see also United States v. Diaz,* **296 F.3d 680, 684 (8th Cir. 2002).**

Second, there was no need for anyone—judge or jury—to specifically find that the transactions making up the $39 million loss had an explicit link to interstate commerce. When a defendant is found guilty of one of the offenses put forth in Section 3D1.2(d) of the Guidelines, as Kimoto was here, losses under Section 2B1.1 and Section 1B1.1 include the losses stemming from the counts of conviction as well as losses that were part of the same course of conduct or a common scheme or plan as the offense of

9

conviction, even if they didn't show up in the indictment.  *E.g.,* **United States v. Lange, 592 F.3d 902, 905-06 (8th Cir. 2010); United States v. Baum, 555 F.3d 1129, 1130-31 (10th Cir. 2009); United States v. Swanson, 483 F.3d 509, 514 (7th Cir. 2007).**  Section 1B1.1 and its proviso for other schemes and plans like the one at issue in the indictment extends to schemes that violate state law as well as federal, so there's no need for the unindicted conduct to link to interstate commerce for the losses to be counted as a part of a federal adjustment.  *See* **United States v. Newbert, 952 F.2d 281, 284-85 (9th Cir. 1991);** *see also* **United States v. Hough, 276 F.3d 884, 898 (6th Cir. 2002).**  The losses counted here were either bound up in the counts of conviction or were part of a common scheme or plan, meaning that the calculation was appropriate.  There was no deficient performance in failing to make a commerce-related objection.

Next up is Kimoto's claim that his counsel performed deficiently by failing to advise him to plead guilty.  To make out an ineffective assistance of counsel claim like that, Kimoto needs to show, over and above shoddy performance by his lawyer, that he suffered prejudice—that there's a reasonable probability that he would have pleaded guilty had he been so advised and that there was a reasonable probability that a guilty plea would have resulted in a lesser sentence.  **United States v. Moore, 416 F. App'x 454, 460-61 (5th Cir. 2011).**  Kimoto's claim trips over both of these prejudice-related hurdles.  For one, there's no reasonable chance that Kimoto would have pleaded guilty in this case, as he has consistently maintained his innocence of the underlying charges—he did so at trial, in his first appeal, in his second *pro se* appeal following a limited remand, and in this proceeding (by arguing that his counts of conviction did not have a

10

sufficient link to commerce so as to violate federal law). In addition, there's nothing to indicate that a guilty plea would have led to a lower sentence in this case. All Kimoto says on that front is that he may have received a reduction for acceptance of responsibility had he pleaded guilty, but the chances of him receiving a reduction were non-existent given the circumstances of his obstruction of justice adjustment. The Federal Trade Commission and other authorities were sniffing at Kimoto's business in 2002, and in response to those investigations Kimoto set fire to his company's records, directed a technology director to destroy backup tapes, told a compatriot to get rid of his computer, and told his employees to delete emails. Kimoto knew that an investigation was underway when he started his ongoing effort to burn the books, and that type of conduct usually doesn't warrant a responsibility reduction, especially when a defendant continues to deny obstruction up to his sentencing and did not voluntarily withdraw from the obstruction before it was finished. *E.g.*, *United States v. Lessner*, **498 F.3d 195, 199 (3d Cir. 2007);** *United States v. Buckley*, **192 F.3d 708, 711 (7th Cir. 1999);** *United States v. Honken*, **184 F.3d 961, 968-69 (8th Cir. 1999).** Kimoto kept up his denial and didn't withdraw from his efforts, so the undersigned wouldn't have given him a responsibility reduction even if he had pleaded guilty. Because there's no indication of prejudice on the guilty plea point, this habeas claim has no merit.

Kimoto's next point is hard to follow—he seems to make a number of arguments concerning the Tenth Amendment and his counts of conviction and his sentence. To the extent Kimoto claims that the transactions girding his convictions didn't have the requisite link to commerce to satisfy the text of the mail and wire fraud statutes, the

Court has already rejected that argument on factual grounds for the reasons stated above—the testimony and exhibits offered at trial demonstrated that the counts of conviction had the necessary link to commerce.   And the fact that each count of conviction satisfied the statutes' various commerce requirements does away with any Tenth Amendment challenge to Kimoto's convictions.  *E.g.*, *United States v. Sedlak*, **529 F. App'x 253, 255 (3d Cir. 2013);** *United States v. Louper-Morris*, **672 F.3d 539, 562-63 (8th Cir. 2012);** *United States v. Rybicki*, **38 F. App'x 626, 630-31 (2d Cir. 2002);** *United States v. Hatch*, **926 F.2d 387, 398 (5th Cir. 1991)**.  To the extent Kimoto claims that the additional transactions used for his loss calculation sentencing enhancement violated the Tenth Amendment because they may have included intrastate transactions, that argument is bunk.   The Tenth Amendment doesn't preclude federal efforts to fix sentences of imprisonment for federal crimes, *United States v. Hernandez-Milan*, **221 F. App'x 905, 907 (11th Cir. 2007)**, so there's no problem with a federal court including within a loss calculation losses from schemes like the one in the indictment that violate state law or concern intrastate transactions.  *E.g.*, *Newbert*, **952 F.2d at 284-85;** *United States v. Barringer*, **248 F. App'x 754, 755 (7th Cir. 2007)**.  Kimoto made similar Tenth Amendment arguments in his last appeal, and those arguments fail here for the same reasons they failed then.  *United States v. Kimoto*, **452 F. App'x 683, 684 (7th Cir. 2011).**

Kimoto's final argument is that his 350-month sentence, comprised of fourteen-month consecutive sentences for each of his nine counts of conviction, constitutes cruel and unusual punishment, and that his lawyer erred by not raising that kind of challenge.   To be sure, the Eighth Amendment prohibits sentences that are grossly

12

disproportionate to the crime committed, and that proviso extends to noncapital sentences. *United States v. Nagel*, **559 F.3d 756, 762 (7th Cir. 2009).** That said, the proportionality principle applied to noncapital sentences is a narrow one—the Supreme Court is of the general view that the fixing of prison terms for specific crimes involves a substantive judgment best left to the legislatures, so successful noncapital challenges are "exceedingly rare." *United States v. Blitch*, **773 F.3d 837, 848 (7th Cir. 2014).** The Supreme Court's rulings show just how high the bar is set: the Court has rejected a challenge to a 25-years-to-life sentence for stealing golf clubs under California's three-strikes law, *Ewing v. California*, **538 U.S. 11, 22 (2003)**; to a life sentence for a first-time offender possessing 672 grams of cocaine, *Harmelin v. Michigan*, **501 U.S. 957, 996 (1991)**, and to consecutive 20-year sentences for possession with intent to distribute a small amount of marijuana, *Hutto v. Davis*, **454 U.S. 370, 370-71 (1982)**.

Three factors guide an Eighth Amendment examination of a sentence: the Court looks at the gravity of the offense and the harshness of the penalty; the sentences imposed on other criminals in the same jurisdiction; and the sentences imposed for commission of the same crime in other jurisdictions. *Solem v. Helm*, **463 U.S. 277, 284 (1983).** The first factor is a threshold one. A court's initial task is to ascertain whether the defendant's case is the rare one in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. *United States v. Gross*, **437 F.3d 691, 693-94 (7th Cir. 2006).** If an inference of disproportionality arises, a court conducts a comparative analysis of the sentence within and between jurisdictions; if it does not, there is no Eighth Amendment problem. *Id.*

There is no inference of gross disproportionality here for two separate reasons. For one, a sentence imposed for a non-capital felony conviction that falls within legislatively prescribed limits will "not be considered disproportionate," absent an argument that the sentencing court "abused its discretion." *United States v. Davis*, 375 F. App'x 604, 605 (7th Cir. 2010). Kimoto's statutory maximum for all of his convictions together was a whopping 245 years in prison and none of his individual sentences exceeded the statutory maximum, so there's no real basis for gross disproportionality here. *E.g., United States v. Herrick*, 512 F. App'x 534, 538-39 (6th Cir. 2013); *United States v. Johnson*, 451 F.3d 1239, 1244 (11th Cir. 2006); *United States v. Campbell*, 242 F.3d 377 (8th Cir. 2000). More fundamentally, this case does not involve a minor offense or an egregiously-long sentence in the face of a mild offense. While Kimoto's crimes were nonviolent and property based, they still did serious damage to the public. Kimoto bilked hundreds of vulnerable victims of their hard-earned cash by way of a vast telemarketing scheme, causing over $30 million in losses along the way. Despite the magnitude of those crimes, Kimoto received a total sentence of 350 months, well below the Guidelines range of stacked sentences to life imprisonment. Given the magnitude of Kimoto's crimes and the sentence imposed, there's nothing constitutionally disproportionate about Kimoto's sentence. *See United States v. McQueen*, — F. App'x —, 2016 WL 232132, at *11 (6th Cir. Jan. 19, 2016).

That covers all of Kimoto's arguments in his § 2255 petition, so his petition must be denied. Kimoto has also filed a number of motions asking the Court to take "judicial notice" of problems with his convictions based on newly-decided Supreme Court cases.

14

Even if these arguments can properly be counted as amendments to his underlying habeas petition and even if the cases apply retroactively to Kimoto's convictions, all of the arguments are wrong on the law, so the motions will be denied. His first two motions rail against the loss calculation on the grounds that those facts must be found by a jury rather than a judge under *Alleyne v. United States*, **133 S. Ct. 2151 (2013)**. As the Court already said, *Alleyne* and cases like it apply only when facts ruled on at sentencing affect either the statutory maximum or minimum, and that didn't happen here. It's true that facts found at Kimoto's sentencing did result in the imposition of consecutive sentences on separate counts, but that doesn't have the effect "of pushing a sentence on any one count above the statutory maximum for a single count of conviction," meaning that *Alleyne* doesn't apply. *Garcia*, **754 F.3d at 473**. Kimoto's third motion says that some or all of his mail and wire fraud convictions should be overturned because they violate the Tenth Amendment after the Supreme Court's ruling in *Bond v. United States*, **131 S. Ct. 2355 (2011)**, but that argument, too, has been foreclosed by the federal courts of appeals even after *Bond* was decided. *E.g., Louper-Morris*, **672 F.3d at 562-63**; *United States v. Jinian*, **725 F.3d 954, 968 (9th Cir. 2013).**

That does away with all of Kimoto's claims of error, but there is one other closing item. Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant, as the applicant can't appeal without one. The habeas statute provides that a certificate may issue only where the petitioner "has made a substantial showing of the denial of a constitutional right," **28 U.S.C. § 2253**, as would be the case when

"reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, **529 U.S. 473, 484 (2000).**   Based upon the record before it, the Court concludes that reasonable jurists wouldn't find Kimoto's points debatable, so the Court must deny a certificate of appealability.

## Disposition

Kimoto's § 2255 motion (Doc. 1), along with Kimoto's motions to take judicial notice (Docs. 11, 12, & 13), are all **DENIED**.  The Court further **DENIES** a certificate of appealability.   The **CLERK** is **DIRECTED** to enter judgment in favor of the United States and against Kimoto.

**IT IS SO ORDERED.**

**DATED:  March 24, 2016**

/s/ **Michael J. Reagan**
**Chief Judge Michael J. Reagan**
**United States District Court**